REVISED January 19, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 06-51133

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 13, 2010

Charles R. Fulbruge III
Clerk

ARETE PARTNERS LP,

Plaintiff–Appellee,

v.

RUDOLF W. GUNNERMAN,

Defendant–Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Arete Partners, L.P. sued Rudolf Gunnerman for breach of contract and fraud in connection with a settlement agreement entered by the parties. Gunnerman appeals from the district court's judgment finding in favor of Arete on its fraud claim, arguing that the district court erred by: (1) misapplying Texas law to find that Gunnerman had fraudulent intent; (2) finding fraudulent intent based on the facts presented; (3) finding fraud because there was no evidence of reliance; (4) calculating Arete's fraud-based damages; and (5) awarding exemplary damages. Because the facts are insufficient to establish that Gunnerman had fraudulent intent, we reverse and remand.

I

Arete originally filed suit against Gunnerman for fraud and breach of contract related to a securities sale. The parties signed a contractual settlement before the case reached the jury. A few months later, Arete filed an amended complaint, alleging that Gunnerman breached the settlement agreement. On the day of trial, the parties once again reached a settlement to resolve Arete's claims against Gunnerman.

The terms of the agreement were read into the district court's record by the attorneys for the parties. Although the record reflects that there was considerable discussion and confusion as to the terms of that agreement during this process, it can, with persistence, be gleaned from that record that the parties agreed: (1) a judgment would be entered in favor of Arete against Gunnerman for $4.5 million; (2) Gunnerman would pay Arete $750,000 in cash; (3) Gunnerman would transfer 1,100,000 shares of unrestricted, fully tradeable SulphCo stock into an escrow account at Goldman Sachs, with instructions to Goldman Sachs to transfer 140,000 shares of SulphCo stock per month to Arete; (4) Arete would sell no more than 35,000 shares of SulphCo stock per week; (5) when Arete received a total of $4.5 million from the sale of stock and the $750,000 cash payment, Arete would execute a release of the judgment; and (6) if and when Arete realized $5,250,000 from the sale of SulphCo stock, Arete would transfer any remaining stock back to Gunnerman. The parties made it clear in the record that any release of the judgment did not end the contractual obligations of the parties. Gunnerman was present in court when the agreement was set forth and stated on the record that he understood the settlement and agreed to its terms.

Gunnerman timely paid Arete $750,000 in cash; however, Gunnerman never transferred 1,100,000 shares into an escrow account. Gunnerman's counsel on securities matters informed him that the sale of SulphCo shares

would trigger certain reporting requirements under the Securities and Exchange Commission's rules. While those reporting issues were being resolved, Arete agreed to accept a wire transfer payment based on the highest closing price for the week the shares were due to be sold.

Gunnerman instructed his contact at Goldman Sachs to divide 1,100,000 shares of SulphCo stock into units of 35,000 shares, in anticipation of having the shares transferred to Arete. Gunnerman's counsel informed Arete's counsel that they anticipated that the shares would be transferred through physical delivery of the certificates to Arete's counsel's office on a weekly basis and that they were in the process of drafting an escrow agreement to facilitate transfer of the shares. Arete objected that Gunnerman's proposed course of action violated the agreement because: (1) the transfer of restricted shares violated the promise of fully tradeable, unrestricted shares, and (2) physical delivery of shares violated the agreement to make a transfer into a Goldman Sachs escrow account. Ultimately, Gunnerman made three transfers of 35,000 shares to Arete, resulting in a transfer of 105,000 shares in total .

After Arete had sold 35,000 shares of the stock, Gunnerman offered to buy back the remaining shares that had already been transferred for the highest market price during the week of transfer. Arete agreed not to sell the stock if Gunnerman wired payment for the stock and also stated that if Gunnerman continued to deliver the 35,000 shares every week, Arete would return the certificates to him when it received payment each week. Subsequently, Arete's counsel informed Gunnerman's counsel that Arete had not received stock for the weeks of April 11th or May 13th. Arete's counsel stated that Gunnerman was in material breach of the agreement, and Arete would begin the process of executing on its judgment unless Gunnerman wired $350,000 to Arete's account. A few days later, Arete's counsel sent an email to Gunnerman's counsel with the subject "Got your message": "I believe that we are still behind one week. I do not

believe we got stock for the week of April 11. Send the money everyweek [sic] for the highest prices will work great. But we need to get the money for week one." Gunnerman's counsel responded, "Ok. I spoke with Stan to confirm."

As a result of this communication, the district court found that the parties modified their agreement, and neither party disputes that finding on appeal. Under the modified agreement, in lieu of stock transfers, Gunnerman agreed to wire transfer cash to Arete at the end of each week, calculating the amount based on the highest closing price for SulphCo stock for that week. Although a formal draft of the parties' amendment to their settlement agreement was prepared, it was never signed. Following the parties' agreement, Gunnerman made cash payments of varying amounts, although the amounts did not appear to bear any particular relation to an identifiable method of calculating Gunnerman's obligations to Arete. The parties continued to dispute both the timing and the amounts of Gunnerman's periodic cash payments.

After the payments stopped altogether, Arete filed this suit against Gunnerman, alleging causes of action for breach of contract and fraud. In response, Gunnerman filed a motion to release the $4.5 million judgment, even though it was undisputed that payments toward satisfaction of that judgment had not reached its full amount. At the time of trial, the total consideration in both cash and stock provided to Arete by Gunnerman was $4,390,390.71, which was the sum of: (1) the initial $750,000 cash payment; (2) the actual proceeds of the 105,000 shares of SulphCo stock sent to Arete by Gunnerman; and (3) the total of the wire transfer payments made in lieu of Gunnerman's stock transfer obligations.

In a bench trial, the district court found in favor of Arete on its causes of action for breach of contract and fraud. The district court noted that Gunnerman had essentially conceded each of the elements of Arete's breach-of-contract claim, and the only dispute on this claim was the proper measure of

damages.  The district court also found in favor of Arete on its fraud claim.  The court found that Gunnerman never intended to keep two distinct promises to Arete: "Gunnerman never intended to permit Arete to realize more than $4.5 million and never intended to perform the agreement to transfer 1,100,000 shares."  The court concluded that the difference between the amount Arete received and what it would have received if Gunnerman had performed the modified agreement as promised was $1,060,649.27.  The court found that Arete was entitled to this amount as actual damages under both its fraud and breach-of-contract causes of action.  Furthermore, because the district court found that Arete's damages were the result of fraudulent promises by Gunnerman, the district court found that Arete was entitled to $500,000 in exemplary damages in addition to its actual damages.  Alternatively, the district court found that Arete was entitled to actual damages plus attorneys fees under its contract claim.  Arete was required to make an election between these two alternative measures of recovery before the entry of judgment; Arete elected recovery based on its fraud claim, and the district court entered judgment.

Gunnerman subsequently filed a motion to amend the judgment and the court's findings of fact and conclusions of law, arguing that the district court had incorrectly found that Gunnerman had fraudulent intent when he entered into the settlement agreement.  The district court rejected Gunnerman's arguments and denied the motion.  Gunnerman then filed this appeal.

II

On an appeal from a bench trial, we review the district court's legal determinations de novo and its factual findings for clear error.[1]  We will find clear error if (1) the findings are without substantial evidence to support them; (2) the court misinterpreted the effect of the evidence; or (3) although there is

---

[1] Rabo Agrifinance, Inc. v. Terra XXI, Ltd., 583 F.3d 348, 352 (5th Cir. 2009).

evidence which, if credible, would be substantial, the force and effect of the testimony, considered as a whole, convinces the court that the findings are against the preponderance of credible testimony.[2]

### III

On appeal, Gunnerman argues that, in finding fraudulent inducement, the district court incorrectly applied Texas law and its factual findings were in clear error. Under Texas law, "[a] fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury."[3] A promise to do an act in the future is an actionable misrepresentation when made with the intent to deceive and with no intention of performing the act.[4] A party's intent is determined at the time the party made the representation; however, a party's intent may be inferred by the party's subsequent acts following the representation.[5] "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made. However, that fact is a circumstance to be considered with other facts to establish intent."[6] Even "slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent."[7] The evidence must be relevant to the defendant's intent at the time the

---

[2] Bd. of Trs. New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Gabriel, Roeder, Smith & Co., 529 F.3d 506, 509 (5th Cir. 2008).

[3] Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998) (internal quotation marks omitted).

[4] Id. at 48.

[5] Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986).

[6] Id. at 435.

[7] Id. (internal quotation marks omitted).

representation was made.[8] "Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise."[9] The Supreme Court of Texas has also noted that "[u]sually, successful claims of fraudulent inducement have involved confessions by the defendant or its agents of the requisite intent."[10]

Gunnerman first argues that the district court incorrectly applied Texas law to find that Gunnerman had the requisite fraudulent intent. Gunnerman maintains that the district court committed an error of law by applying the Texas Supreme Court's decision in Spoljaric v. Percival Tours, Inc.,[11] rather than its decision in Miga v. Jensen.[12] Spoljaric held that "[a] promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act."[13] In Miga, the Texas Supreme Court concluded that there was no evidence to support the jury's finding of fraud and held that a "dispute at trial over the contract's terms [was] not evidence that Jensen did not intend to perform" at the time he entered the contract.[14] The court held that this was "a classic breach of contract case" and that the wronged party had "no cause of action for fraud."[15]

Gunnerman misapprehends the court's decision in Miga. Miga did not supplant Spoljaric; instead, Miga is an application of the legal principles

---

[8] Formosa Plastics, 960 S.W.2d at 48.

[9] Spoljaric, 708 S.W.2d at 435.

[10] Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 305 (Tex. 2006).

[11] 708 S.W.2d 432 (Tex. 1986).

[12] 96 S.W.3d 207 (Tex. 2002).

[13] 708 S.W.2d at 434.

[14] 96 S.W.3d at 211.

[15] Id.

discussed in Spoljaric. The court held in Miga that the parties' dispute over contractual terms at trial was insufficient evidence that a party did not intend to perform. In other words, the evidence was insufficient to satisfy the test for fraudulent intent as set forth in Spoljaric. Here, in order for Arete to recover under its fraud claim, Arete was required to prove that Gunnerman entered into the settlement agreement "with the intention, design and purpose of deceiving, and with no intention of performing the act."[16]

Gunnerman contends that there is no evidence of fraudulent intent. The district court found that "[t]he evidence of record establishes Gunnerman never intended to keep two distinct promises to Arete: (1) that Arete would have the opportunity to sell 1,100,000 shares of SulphCo stock; and (2) that Arete could achieve a maximum recovery of $5.25 million as proceeds on the sale of SulphCo stock." The district court based its finding of fraudulent intent on two factors: (1) Gunnerman's interpretation of the settlement agreement, and (2) Gunnerman's "pattern of malfeasance."

As a matter of law, the district court held that the parties had agreed that Arete would have the opportunity to realize $6,000,000 from (1) Gunnerman's payment of $750,000 together with (2) the sale of 1,100,000 shares of stock. Gunnerman testified that his understanding of the agreement differed from the district court's. Gunnerman stated that although he understood that Arete would have the opportunity to realize $6,000,000 from the sale of stock if the market price were high enough, he thought that his payment of $750,000 was to be credited toward his obligation to transfer 1,100,000 shares of stock.

The district court found Gunnerman's interpretation of the parties' agreement to be "inconsistent and unbelievable" and that Gunnerman's position "was entirely fabricated after the fact." The court noted,

---

[16] See Spoljaric, 708 S.W.2d at 434.

> When the agreement was originally dictated into the record . . . , there were clearly two separate obligations undertaken by Gunnerman—one for the payment of cash and one for the transfer of stock. The cash–stock equivalency issues never appeared until Gunnerman refused to transfer the stock to Goldman Sachs, as required under the original agreement.

The court found that "Gunnerman never intended to permit Arete to realize any more than $4.5 million and never intended to perform the agreement to transfer 1,100,000 shares" and that "Gunnerman used the modification [to a cash-based transaction] to create a colorable basis for his alleged confusion over the total amount of his obligations to Arete." In its order denying Gunnerman's motion to amend the judgment, the court also found that "Gunnerman's so-called interpretation of the parties' agreement was so facially meritless and self-serving that, for the purposes of ascertaining fraudulent intent, it was the equivalent of a denial that he ever made the agreement with Arete."

We note that there was a possibility that Arete could have realized a total of $6,000,000 under the modified settlement agreement if the market price of the stock for which Gunnerman did make payment had been higher. But even if Gunnerman's testimony as to his understanding of the agreement is at odds with the agreement's actual terms, there is insufficient evidence of intent to defraud at the time the agreement was made.

As noted, in Miga v. Jensen, the Texas Supreme Court held that a dispute over contract terms at trial was not evidence that the defendant did not intend to perform: "Jensen's conduct after Miga's resignation in 1994 and his dispute at trial over the contract's terms are not evidence that Jensen did not intend to perform when he offered Miga the PGE option in 1993. This is a classic breach of contract case; Miga has no cause of action for fraud."[17] In Miga, Jensen orally

---

[17] 96 S.W.3d at 211.

granted an option to Miga to purchase 4.8% of Jensen's interest in a corporation for a specific price.[18] About eighteen months later, Miga resigned and attempted to exercise the option.[19] Jensen presented Miga with a written agreement that was to be a "'complete accounting,'" but it did not explicitly release Miga's option.[20] Miga agreed to the terms of the termination agreement, but on the same day, he attempted to exercise the option and Jensen refused to perform.[21] Miga sued for breach of contract and fraud. At trial, Jensen contended that the option had been for a "scaled price," was subject to a buy-back if Miga resigned, and was released by the termination agreement the parties reached when Miga resigned.[22] The jury found against Jensen and for Miga on all issues, including fraud.[23] The Supreme Court of Texas held there was no evidence that Jensen did not intend to perform at the time he granted the option.[24] That court explicitly rejected the argument that Jensen's disagreement about the option's terms "was tantamount to a denial of the option agreement that the jury found he made."[25]

The facts of the present case are indistinguishable from those at issue in Miga. Although the district court recognized that "a good faith difference in interpretation over the meaning of a particular contract provision is not evidence of fraudulent intent," it attempted to distinguish Miga based on a finding that Gunnerman's testimony regarding his understanding of his obligations under

---

[18] Id. at 209.

[19] Id.

[20] Id.

[21] Id.

[22] Id.

[23] Id. at 209-10.

[24] Id. at 210-11.

[25] Id. at 210.

the original agreement was knowingly false. The district court reasoned that "when a defendant puts forward a self-serving, facially meritless interpretation of a contract, the effect of which would be to relieve the defendant of some or all of his obligations under the contract, the interpretation is effectively the same as a denial that an agreement was ever made." This is contrary to Texas authorities. To uphold a fraud finding on such a basis would permit a factfinder to find fraud simply by disbelieving that a party's interpretation of an agreement was offered in good faith belief of its correctness. In other words, fraud could be based solely on a credibility determination when a witness testified as to his or her understanding of the terms of an agreement. The Texas Supreme Court held otherwise in Miga.

The district court's conclusion is also contrary to the approach taken by the Texas Supreme Court in Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.[26] In that case, Formosa had represented in a bid package it submitted to Presidio and in the construction contract the two parties subsequently signed that Presidio would have control over concrete deliveries.[27] Formosa's interpretation of its obligations under the contract in this regard was contrary to the "specific[] and unequivocal[]" terms of the contract and "even Formosa's own witnesses admitted that, under the plain language of the contract, Presidio had control over the scheduling and delivery of concrete."[28] However, the court based its determination that there was "legally sufficient evidence that Formosa made representations with no intention of performing as represented" not on this evidence but on direct evidence from a Formosa employee that, contrary to the representation in the bid package it submitted to

---

[26] 960 S.W.2d 41, 48 (Tex. 1998).

[27] Id.

[28] Id.

Presidio and two weeks before the contract was signed, Formosa decided "to take over the delivery of the concrete without informing Presidio"; Presidio was not informed of this decision until after the contract was signed; and a Formosa employee testified that "Formosa acted deceptively by taking over the concrete delivery and scheduling when the bid package expressly provided that the contractor would have control," and "that Formosa knew that Presidio would rely on this representation in preparing its bid."[29]

Even though the district court found Gunnerman's interpretation to be contrary to the plain terms of the agreement, Gunnerman's interpretation of the agreement, standing alone, is not evidence of fraudulent intent. The district concluded that "Gunnerman used the modification [to a cash-based transaction] to create a colorable basis for his alleged confusion over the total amount of his obligations to Arete." But here again, there is no evidence that at the time the parties agreed to modify their settlement agreement, Gunnerman had no intention of performing and intended that Arete rely to its detriment on the modified terms.

In its order denying Gunnerman's motion to amend the findings of fact and the judgment, the district court stated that it also found "Gunnerman's pattern of malfeasance to be persuasive evidence of Gunnerman's fraudulent intent," pointing to Gunnerman's alleged breach of an earlier settlement agreement in connection with this litigation. The district court is clearly entitled to assess Gunnerman's credibility based on Gunnerman's "pattern of malfeasance."[30] However, Gunnerman's conduct during pre-trial proceedings and his prior alleged breach of a settlement agreement is not sufficient evidence to show that Gunnerman did not intend to perform the settlement agreement at issue here.

---

[29] Id. at 48-49.

[30] See FED. R. CIV. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

In a jury trial, generally we would not permit a party to introduce as evidence of fraud in the inducement the history of prior suits and settlements between the parties, discovery skirmishes or possible discovery abuses, or pre-trial conduct that was displeasing to the trial judge. The same standards apply in a bench-tried case. Although sanctions for conduct during discovery and other pre-trial proceedings may be warranted in some circumstances, Gunnerman's conduct is not evidence of fraudulent intent at the time that he reached the original or modified settlement agreement with Arete, and imposition of punitive damages for any such conduct is impermissible.

Because the evidence is insufficient to support a finding of fraud, we do not reach Gunnerman's remaining arguments regarding reliance and the proper measure of fraud damages.

\* \* \*

For the foregoing reasons, we REVERSE and VACATE the district court's award of actual and exemplary damages based on Arete's fraud claim, and we REMAND to allow Arete to elect recovery under its breach-of-contract claim.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

This appeal challenges the specific finding of fraudulent intent by the district court; a finding we review for clear error. In finding fraudulent intent, the district court relied on Gunnerman's indefensible post-execution reading of the contract and his efforts to avoid trial throughout the litigation, which involved tactics intended to delay and frustrate the opposing party and the court, including courthouse settlements he did not intend to honor, all resulting in three scheduled trials and two settlement agreements. Seeing this conduct as sufficient evidence of fraudulent intent to support the district court's findings that there was no intent to perform the settlement agreement when it was entered, I must dissent, respectfully.

I

As a preliminary matter, in characterizing the district court's opinion as suggesting "fraud could be based solely on a credibility determination when a witness testified as to his or her understanding of the terms of an agreement," the majority relies on statements made by the district court in its order denying Gunnerman's Motion to Amend Findings of Fact and Motion to Amend Judgment, an order directed at specific objections to the court's findings made by Gunnerman. The isolating focus on that language unfairly describes the footing of the district court's finding of an intent not to perform when the settlement agreement was signed, and does not fully capture the district court's findings that are the subject of this appeal. The district court's order also pointed to Gunnerman's pattern of conduct as the subject of its fourteen pages of Findings of Fact, a copy of which I attach.

14

II

These Findings of Fact make plain that the district court did not base its finding of fraud solely on the silliness of Gunnerman's contract interpretation. Rather the district court relied on his pattern of conduct throughout the litigation, finding that his truculent ducking and dodging to escape judgment day evidenced an intent from the start not to perform the "settlement agreement," which was a central part of his dodge.[1]  Despite its prominence in the district court's Findings, the history of Gunnerman's conduct is absent from the majority's opinion:  Arete originally sued Gunnerman for breach of contract relating to a purchase of stock.  The first trial was commenced on October 25, 2004, but before closing arguments the parties reached a settlement.  Having avoided judgment, Gunnerman within days breached the settlement agreement. In February 2005, Arete sued Gunnerman for the breach.  Judge Sparks promptly set the case for a second jury trial for March 28, 2005.  Gunnerman responded with delaying tactics,  refusing to be deposed and making himself unavailable for the deposition by repairing to South Korea where he claimed he became ill and could not return.  With the second trial imminent the parties reached another settlement agreement, the one at issue here—and this, just as the first agreement, lived only long enough to avoid trial.  This suit followed, alleging breach of contract and fraud.  Judge Sparks set the case for trial for a third time for February 21, 2006—now one year after the second setting. However, as the district court found, Gunnerman again deployed his delaying tactics, failing to answer interrogatories under oath, failing to present himself for deposition, and breaching express representations he would appear for trial on February 21, 2006—all findings unchallenged here.  With regards to this last

---

[1]  The majority asserts that in an ordinary fraud in the inducement case the evidence of intent not to perform would not include difficulties of discovery in that litigation.  This is a settlement agreement entered into as part of a course of action calculated to avoid trial.  The argument that this evidence would not be admitted is puzzling.

finding, Gunnerman claimed through his daughter he was ill, and filed a medical statement the trial court found to be "meaningless."

Based on this conduct, including inconsistent and unbelievable testimony regarding his understanding of the parties' agreement, the district court concluded that Gunnerman never intended to fulfill the promises he made in the settlement agreement.

### III

Under Texas law disagreement over contract interpretation alone is insufficient evidence that performance was never intended.[2] While Texas courts carefully police the boundaries of contract law lest tort law run it over, it does so with its rule that even "slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent."[3] The majority goes much further and in doing so upsets this balance of operating spheres for tort and contract law. It does so at the expense of basic legal principles controlling fraudulent conduct.[4] Gunnerman's actions, described by the district court, are sufficient evidence to support the findings of fraud. That this conduct was sanctionable does not mean that it was not also evidence of an intent not to perform an agreement made to escape the judgment day of trial. This veteran district judge, with a lifetime of

---

[2] Miga v. Jensen, 96 S.W.3d 207, 210-11 (Tex. 2003). Though the majority characterizes this case as materially indistinguishable from Miga, here the district court did not rely solely on the disagreement over the terms of the contract as evidence of fraud as the trial court did there. Miga does not control.

[3] Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 305 (Tex. 2007) (citing Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986)).

[4] The majority's handwringing over opening the door to claims of fraud in all contract disputes by a finding that a party in breach lacked credibility is misplaced. The district court did not do that. It simply recognized the age old "D and D" defense—ducking and dodging—in a case where it was plain.

trial experience, was better equipped to make this judgment than this court. More to the point, a federal district court is not a mere entry gate to the Court of Appeals. It is an independent court to which we owe a legal duty of deference. We fail that duty today. Put simply, that we might have reached a different conclusion in the first instance is of no moment. As I find no error in the judgment of the district court, and certainly not clear error, I respectfully dissent.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



ARETE PARTNERS, L.P.,

          Plaintiff,

-vs-                                         Case No.  A-05-CA-921-SS

RUDOLF W. GUNNERMAN,

          Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BE IT REMEMBERED on the 21st day of February 2006, the Court called the above-captioned matter for trial and the parties appeared through counsel. The Court had set this case specifically and specially for trial on February 21, 2006, by order entered on December 2, 2005. The history of litigation between these parties is important to understand the following findings of fact.

On September 26, 2003, Arete Partners, L.P., ("Arete") filed suit against Clean Fuels Technology, Inc. ("Clean Fuels") and Rudolf Gunnerman in the 200th District Court of Travis County, Texas, suing both defendants for breach of contract in connection with Arete's purchase of Clean Fuels stock under a so-called "most-favored nations" agreement. The case was timely removed to this Court on or about October 29, 2003, and assigned cause number A-03-CV-784. A scheduling order was entered on January 5, 2004. On June 14, 2004, Arete filed a second amended complaint alleging defendant Gunnerman had not only breached the contract but also had committed fraud. Jury selection and trial were scheduled for October 25, 2004. However, prior to jury selection, the parties agreed to the dismissal of Clean Fuels, and the case proceeded only against Rudolf Gunnerman. A jury was selected and trial proceeded on October 25, 2004.

After the presentation of the evidence, the preparation of the jury instructions, and before oral argument, the parties announced they had entered into a settlement agreement and requested the Court to order a mistrial to allow the parties to effectuate the settlement. However, on February 8, 2005, Arete filed its third amended complaint, again alleging Defendant Gunnerman breached his contract—this time the settlement contract—as he had failed to pay the agreed sum of $2.4 million to Arete, failed to secure this payment by escrowing one million shares of SulphCo Inc. ("SulphCo") stock, and failed to transfer five hundred thousand shares of SulphCo stock to Arete. Because of the circumstances, a second jury trial was scheduled for March 28, 2005.

In February, Gunnerman refused to make himself available for deposition, and the Court ordered him to be deposed within ten days of the Court's order or sanctions would be entered. Arete filed a motion for summary judgment, and an extension of time to respond was granted because Gunnerman had not been deposed. At that time, Gunnerman deliberately made himself unavailable for the deposition by allegedly going to South Korea. On February 25, 2005, in open court, counsel for Gunnerman represented that Gunnerman had become ill in South Korea, was hospitalized, and would be unable to travel for weeks. The Court then again extended the time to respond to the pending motion for summary judgment, but refused to continue the trial setting.

The second trial was to begin on March 28, 2005, and with a jury panel available, again the parties, through counsel, advised a settlement had been reached. This time the settlement agreement was dictated into the record and was clear and unambiguous. First, a judgment would be entered in favor of Arete against Gunnerman for $4.5 million. Second, a collateral agreement required Gunnerman to pay Arete the sum of $750,000.00 cash on or before April 2, 2005. Third, Gunnerman was contractually obligated to transfer, by April 11, 2005, 1,100,000 shares of unrestricted, fully

-2-

tradeable SulphCo stock into an escrow account at Goldman Sachs with instructions to Goldman Sachs to transfer 140,000 shares of SulphCo stock per month to Arete. Arete agreed to sell no more than 35,000 shares of SulphCo stock per week, and under this procedure, when and if Arete realized $5,250,000.00 from the sale of SulphCo stock, any remaining stock would be transferred back to Gunnerman. Therefore, with the cash payment of the $750,000.00 and possible recovery of $5,250,000.00 from the sale of SulphCo stock, Arete could realize a maximum of $6 million as a result of the settlement contract. The parties further agreed that when Arete had received a total of $4.5 million from all sources—the sale of the stock, the $750,000 cash payment, and any other source—it would execute a release of the March 28, 2005 judgment. The parties made it clear in the record any release of the judgment did not end the contractual obligations of the parties. Gunnerman was in court and stated in the record he understood the settlement and agreed to the terms. Thereafter, the jury panel was released and the judgment entered.

On October 31, 2005, Arete Partners, L.P., filed the instant suit in cause number A-05-CV-921 against Gunnerman for breach of contract and fraud, alleging specifically that Gunnerman, again, deliberately failed to transfer the SulphCo stock into the escrow account; deliberately failed to deliver 35,000 shares of SulphCo stock per week to Arete; and moreover, never intended to comply with the contractual obligations he made to avoid trial number two on March 28, 2005. Arete sued for contractual damages, alternately for fraud, and sought actual and punitive damages.

Gunnerman then filed a motion to declare the judgment of March 28, 2005, in cause number A-03-CV-784, released when the undisputed evidence was all payments of every nature made by

-3-

Gunnerman to Arete had not reached the $4.5 million judgment amount. That motion was denied on December 1, 2005.

Under those circumstances, trial in A-05-CV-921 was immediately set for February 21, 2006. Gunnerman continued in his delaying tactical manner by declining to answer interrogatories under oath, failing to present himself for deposition, and importantly, breaching express representations he would appear for trial on February 21, 2006. On the date set for trial, Gunnerman's lawyer advised he had been informed by Gunnerman's daughter that Gunnerman was feeling ill and had been admitted to a hospital and was unable to attend the trial. A meaningless medical statement was produced and filed of record, but counsel for Gunnerman indicated that, if he could supplement the record with Gunnerman's deposition to be taken at a later date, he would not file any motion for continuance. This procedure was agreed to by counsel for Arete and the non-jury trial proceeded. Plaintiff filed a trial brief along with a copy of Gunnerman's deposition on March 13, 2006, and post-trial briefing was completed on April 3, 2006.

Based on the testimony and documentary evidence presented at the trial, along with Gunnerman's deposition testimony, the Court makes the following factual findings. First, the parties' original settlement agreement was clearly dictated into the record on March 28, 2005, and its terms cannot reasonably be disputed. Arete, for its part, was required to surrender its right to recover any more than $4.5 million on the judgment itself in the original lawsuit. Gunnerman, on the other hand, was obligated to perform two independent obligations. First, the agreement required Gunnerman to make a cash payment of $750,000. Independently, Gunnerman was required to transfer to Goldman Sachs 1,100,000 shares of unrestricted, fully tradeable SulphCo stock for Arete's benefit. Although there was a limit on the total amount Arete could recover through the sale

-4-

of the stock—$5.25 million (for a grand total recovery of $6 million after accounting for the $750,000 cash payment)—the parties made clear that Arete's recovery of $4.5 million would have no effect on Gunnerman's contractual obligations. Rather, the only impact of Arete's realizing $4.5 million would be the release of the agreed judgment.

Although Gunnerman made a timely payment of $750,000 on March 31, 2005, almost immediately thereafter, it became clear he would not follow the terms of the parties' original settlement agreement. Initially, Gunnerman alleges he was advised by his corporate counsel that because of certain SEC rules, Arete's sale of SulphCo shares would trigger certain complicated reporting requirements. While those reporting issues were being worked out, on April 6, 2005, Gunnerman's counsel sought permission for Gunnerman to make a cash payment that would be equivalent to the sale of the 35,000 shares of stock Arete would have been permitted to sell for the week of April 11, 2005.[1] Ex. P-11. Gunnerman's counsel offered to base the cash payment on either the average closing price or the highest closing price for the week. *Id.* Counsel for Arete responded that Arete would accecpt a wire transfer payment based on the highest closing price for the week made by 5:00 p.m. on the Friday the week the shares were due to be sold. *Id.*

April 11, 2005 came and went, and no shares of SulphCo stock were escrowed. The following day, Gunnerman's counsel informed Arete that he was preparing an escrow agreement and would begin making physical delivery of restricted shares to Arete in the near future. Ex. P-10. Arete objected that Gunnerman's proposed course of action violated the agreement because: (1) the transfer of restricted shares violated the promise of fully tradeable, unrestricted shares; and

---

[1] Although this email communication advised that there might be a problem initially with the sale of shares by Arete, there was no indication that Gunnerman could not comply with his obligations to *escrow* the 1,100,000 shares of stock by April 11, 2005. Ex. P-11.

-5-

(2) physical delivery of shares violated the agreement to make a transfer into a Goldman Sachs escrow account, which was intended to facilitate an efficient broker-to-broker transfer. During the week of April 11, 2005, no escrow was made, no shares were transferred, and no cash wire transfer payment was made in lieu thereof.

On Monday, April 18, 2005, Gunnerman sent 35,000 shares of stock via Federal Express to Arete. Two more deliveries of 35,000 shares were made on April 22, 2005 and May 2, 2005. During this time, Gunnerman offered to buy Arete out of the agreement for the difference between the amounts Arete had already received and $4.5 million. Arete declined Gunnerman's offer.

On May 18, 2005, counsel for Arete wrote an email offering Gunnerman an alternative to complying with the terms of the original agreement. He wrote:

> I believe that we are still behind one week. I do not believe we got stock for the week of April 11. Send the money everyweek [sic] for the highest prices will work great. But we need to get the money for week one.

Ex. P-23. Counsel for Gunnerman responded: "Ok. I spoke with Stan to confirm." *Id.* On June 2, 2005, Gunnerman transferred $447,300 to Arete. According to Gunnerman's counsel, this amount was based on a theoretical sale of 105,000 shares of SulphCo stock at the highest closing prices during two different weeks in May. A formal draft of the parties' amendment to their settlement agreement was prepared but was never signed. Gunnerman continued to make cash payments of varying amounts through December of 2005, none of which appeared to bear any particular relation to an identifiable method of calculating his accruing obligations to Arete.

The parties agree that the total consideration in both cash and stock provided to Arete by Gunnerman was $4,390,390.71. This amount represents: (1) the initial $750,000 cash payment on March 31, 2005; (2) the actual proceeds of the 105,000 shares of SulphCo stock sent to Arete by

Gunnerman—$456,239.98; and (3) the total of the wire transfer payments made in lieu of Gunnerman's stock transfer obligations under the parties' modified agreement—$3,184,150.73. No stock or cash has been paid to Arete since December 20, 2005.

Arete asserts causes of action for breach of contract and fraud. To prove its cause of action for breach of contract, Arete must establish: (1) the existence of a valid contract; (2) that it performed or tendered performance; (3) that Gunnerman breached the contract; and (4) that it suffered damages as a result of Gunnerman's breach. *Hussong v. Schwan's Sales Enterp., Inc.*, 896 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no writ). Arete also seeks recovery from Gunnerman under a fraud theory. "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). "Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise." *Id.* at 435.

In his post-trial brief, Gunnerman essentially concedes the presence of each of the elements of Arete's contract claim. His only dispute is over the proper measure of damages. In Gunnerman's view, the only damages to which Arete is entitled is the difference between the value of the cash and stock he has already tendered to Arete and $4.5 million. In other words, Gunnerman believes Arete's recovery should be limited $109,609.29. However, Gunnerman's theory that he owes no more than $109,609.29 is entirely unsupportable based on the terms of the parties' original agreement as well as the terms of the modified agreement, the latter of which replaced stock transfers with cash

-7-

payments that were based on the equivalent of weekly sales of 35,000 shares of stock at the highest closing price for each week.[2]

At his deposition, Gunnerman gave testimony regarding his understanding of the parties' agreement that was both inconsistent and unbelievable. Gunnerman's position was the $750,000 cash payment was to be included as a part of his obligation to make a transfer of 1,100,000 shares. Ex. P-56 at 11–12. While he insisted that Arete "could have gotten up to $6 million" had the stock been higher in price, he also stated that he did not agree that Arete would have the "opportunity to collect $750,000 plus $5,250,000 from the sale of stock." *Id.*

Gunnerman admitted he "always intended to get credit on the 1,100,000 shares of stock" for the $750,000 payment he made up front. *Id.* at 23. This despite the fact that such a credit would have made absolutely no sense in the context of the original agreement. When the agreement was originally dictated into the record on March 28, 2005, there were clearly two separate obligations undertaken by Gunnerman—one for the payment of cash and one for the transfer of stock. The cash-stock equivalency issues never appeared until Gunnerman refused to transfer the stock to Goldman Sachs, as required under the original agreement.

The Court finds Gunnerman's position that he always understood the $750,000 payment could offset his obligation to transfer the 1,100,000 shares was entirely fabricated after the fact.

_____

[2] Gunnerman argues that the cash payments should have been based on the average stock price rather the highest closing price for each week. However, there is not a single piece of evidence in the record to indicate that Arete ever acceded to such a method of calculation. Moreover, Gunnerman's counsel specifically accepted the highest weekly closing price as the appropriate measure of Gunnerman's modified obligations on two separate occasions. First, in a May 18, 2005 email, Gunnerman's counsel accepted Arete's offer of substitute performance based on cash payments at the highest weekly closing prices. Ex. P-23. Thereafter, Gunnerman's counsel sent Arete an email that its first cash payment under the new agreement was expressly based on the highest weekly price of two weeks in May of 2005. Ex. P-27. There is simply no basis in the record for concluding the parties agreed to anything other than calculating Gunnerman's substituted cash obligations at anything other than SulphCo's highest weekly closing price.

-8-

Furthermore, the Court finds that Gunnerman's initial requests to convert the agreement from a stock-based transaction to a cash-based transaction were part of the fraud he was attempting to perpetrate on Arete and on this Court. Specifically, Gunnerman used the modification to create a colorable basis for his alleged confusion over the total amount of his obligations to Arete. That is, once he had induced Arete to agree to accept cash in lieu of the required shares of stock, he would then, and only then, be able to claim with a straight face that the cash payment required by the agreement at the outset could be applied to his stock transfer obligations. The Court expressly finds Gunnerman never intended to permit Arete to realize any more than $4.5 million and never intended to perform the agreement to transfer 1,100,000 shares. The evidence of record establishes Gunnerman never intended to keep two distinct promises to Arete: (1) that Arete would have the opportunity to sell 1,100,000 shares of SulphCo stock; and (2) that Arete could achieve a maximum recovery of $5.25 million as proceeds on the sale of SulphCo stock. Indeed, it appears to the Court that Gunnerman is allergic to the truth.

Under either a contract theory or a fraud theory, Arete's damages are properly measured under a benefit-of-the-bargain calculus. *See Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 317 n.6 (Tex. App.–Dallas 2004, no pet.) ("The normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure."); *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 208 (Tex. App.–Austin 1998, pet. denied) ("Texas law clearly recognizes benefit-of-the-bargain damages for common law fraud"). The benefit-of-the-bargain measure of damages requires the Court to look at the difference in value between what Arete was promised and what it actually received.

-9-

Arete has offered several different methods for calculating its damages, some of which are based on the prevailing price of SulphCo stock on December 20, 2005, the date on which Arete contends Gunnerman "decided to stop paying Arete." Pl.'s Trial Br. at 6. However, any method of calculating damages that presumes Gunnerman's obilgations to transfer actual stock were still in place after May 2005 would clearly be improper since, as Arete has shown, the parties agreed to an alternative arrangement whereby Gunnerman was ultimately permitted to transfer cash in lieu of actual stock. Instead, a proper benefit-of-the-bargain analysis requires the Court to begin by hypothesizing what would have happened had Gunnerman performed his obligations as promised. Under the terms of the original agreement, Gunnerman would have transferred $750,000 in cash to Arete before April 2, 2005 and transferred 1,100,000 shares of stock to Goldman Sachs for Arete's benefit by April 11, 2005. Arete could then begin selling shares at a rate of no more than 35,000 per week.

The Court next considers what actually happened. Gunnerman did not make any shares available to Arete that would have allowed it to make any sales during the week of April 11, 2005. He did, however, make three transfers that allowed Arete to make sales for the following three weeks. Thereafter, the parties' reached their modified agreement that allowed Gunnerman to substitute cash payments for the stock Arete would have been authorized to sell. Accordingly, under the original agreement, as subsequently modified, the Court finds Arete was entitled to expect the following performance from Gunnerman: For weeks 2,3, and 4 of the agreement, Arete was entitled to 105,000 shares of actual stock. For each week that Arete could have sold stock had Gunnerman performed under the parties' original agreement, including the week of April 11, 2005, Arete was entitled to a cash payment equivalent to 35,000 shares of stock at the highest closing price of the

-10-

week. The total cash payments which Arete was entitled to receive under this scenario are as follows:

| Week beginning | High Closing Price | Expected Payment |
|---|---|---|
| April 11, 2005 | $5.68 | $198,800 |
| April 18, 2005 | $5.60 | None—Actual shares received |
| April 25, 2005 | $5.46 | None—Actual shares received |
| May 2, 2005 | $4.80 | None—Actual shares received |
| May 9, 2005 | $3.99 | $139,650 |
| May 16, 2005 | $3.70 | $129,500 |
| May 23, 2005 | $3.85 | $134,750 |
| May 30, 2005 | $3.90 | $136,500 |
| June 6, 2005 | $4.10 | $143,500 |
| June 13, 2005 | $3.69 | $129,150 |
| June 20, 2005 | $4.49 | $157,150 |
| June 27, 2005 | $4.10 | $143,500 |
| July 4, 2005 | $3.44 | $120,400 |
| July 11, 2005 | $3.83 | $134,050 |
| July 18, 2005 | $3.68 | $128,800 |
| July 25, 2005 | $3.80 | $133,000 |
| August 1, 2005 | $3.60 | $126,000 |
| August 8, 2005 | $3.80 | $133,000 |
| August 15, 2005 | $4.16 | $145,600 |
| August 22, 2005 | $5.25 | $183,750 |
| August 29, 2005 | $4.88 | $170,800 |
| September 5, 2005 | $4.94 | $172,900 |
| September 12, 2005 | $4.80 | $168,000 |
| September 19, 2005 | $4.75 | $166,250 |

| | | |
|---|---|---|
| September 26, 2005 | $4.57 | None[3] |
| October 3, 2005 | $4.65 | $162,750 |
| October 10, 2005 | $4.47 | $156,450 |
| October 17, 2005 | $4.51 | $157,850 |
| October 24, 2005 | $4.55 | $159,250 |
| October 31, 2005 | $4.63 | $162,050 |
| November 7, 2005 | $4.10 | $143,500 |
| November 14, 2005 | $3.99 | $139,650 |
| November 21, 2005 | $4.55 | $68,250[4] |
| | | **Total:** |
| | | $4,244,800.00[5] |

Gunnerman actually wired Arete cash in the total amount of $3,184,150.73 during this period. Thus, the difference between the amount Arete received and what it would have received if Gunnerman had performed the modified agreement as promised is $1,060,649.27.[6] This figure

---

[3] The parties' original agreement called for shares to be delivered to Arete at a rate of 140,000 per month on the first of every month (with the exception of April, during which shares were to be transferred on the 11th). Coupled with the fact that there are more than four weeks in almost every month, this means that Arete would not have had 35,000 shares available to sell for every week it would have been selling Sulphco stock. Specifically, for the week beginning September 26, 2005, Arete would have sold all previously transferred shares, and it would not receive a new allotment until the following week. Thus, the week beginning September 26, 2005 is designated as a no-sale week in the table.

[4] Although each of the other weekly totals is based on 35,000 shares at the highest weekly closing price, the final weekly total is based on 15,000 shares since only that many shares would remain in the final week of the agreement.

[5] At trial, Arete presented a damages expert, Louis Stephen Kokernak, to testify on various calculations for its damages. The Court declines to rely on his figures for two reasons. First, in his report, Kokernak made basic errors in recording the highest closing price for the weeks beginning May 30, 2005 and July 4, 2005 by assigning each a weekly closing price from days that fell outside of each respective week. Second, although Kokernak's testimony reflects he understood the effect that the 140,000 per month limitation would have on Arete's expected payments, his report does not reflect his calculations were modified to account for this effect.

[6] There is no dispute that Gunnerman actually delivered the $750,000 initial cash payment as promised, and that he tendered 105,000 actual shares during the three week period beginning April 18, 2005. Thus, those amounts are not at issue in this calculation.

-12-

represents Arete's actual damages under both its fraud[7] and contract causes of action.

Because the Court finds Arete has shown, by clear and convincing evidence, that its expectancy damages were the result of fraudulent promises by Gunnerman, it is entitled to an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1). In formulating an appropriate exemplary damages award, the Court considers: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which the defendant's conduct offends the public sense of justice and propriety. *Sanders v. Baucum*, 929 F. Supp. 1028, 1039 (N.D. Tex. 1996) (citing *Alamo Nat'l Bank of San Antonio v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)). Considering these factors and the individual circumstances of this case,[8] the Court finds $500,000 is an appropriate exemplary damages award.

In the alternative, Arete is entitled to its damages under the contract, plus attorney's fees. *See Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 422 & n.9 (Tex. App.–Houston [1st Dist.] 1994, writ denied) (explaining that a party prevailing on causes of action for both fraud and breach of

---

[7] Arguably, the fraud measure of damages is slightly different than the contract measure because the fraudulent promises underlying the fraud claim were made in the course of the formation of the original, rather than the modified, settlement agreement. However, because Arete's reliance on Gunnerman's false promises was also a factor in its acceptance of the modifications to the original agreement, the Court holds Arete's expectancy with respect to the modified agreement provides the appropriate basis for calculating Arete's fraud damages.

[8] Although Gunnerman's conduct in making promises he never intended to keep is sufficient on its own to support this award of exemplary damages, the Court would further note that Gunnerman has consistently flouted his legal obligations in these proceedings and shown a disregard for how his conduct would affect everyone else involved. In both this case and the previous lawsuit, Gunnerman repeatedly failed to appear for scheduled court proceedings, failed to willingly participate in satisfying a number of his discovery obligations, and failed to honor agreements made by his counsel on his behalf. In sum, Gunnerman has consistently shown he has no regard for how his conduct affects anyone but himself.

Gunnerman's thoughtless disregard of the rights of Arete is highlighted by a comment he made to his counsel concerning his decision to release SulphCo shares to Arete via physical delivery rather than through the broker-to-broker arrangement he agreed to. As his counsel summarized it, Gunnerman said "that he will not wire the shares; Arete will get them via paper; and Arete can wipe their ass with them for all Rudy cares." Ex. P-7.

-13-

contract may obtain either actual and exemplary damages for fraud *or* actual damages plus attorney's fees under the contract); TEX. CIV. PRAC. & REM. CODE § 38.001(8). Before the entry of judgment, Arete must make an election between these two alternative measures of recovery. *Star Houston*, 886 S.W.2d at 422–23.

## Conclusion

In accordance with the foregoing:

IT IS ORDERED that Arete has established its breach of contract claim against Gunnerman by a preponderance of the evidence and is thus entitled to actual damages under the contract in the amount of ONE MILLION SIXTY THOUSAND SIX HUNDRED FORTY-NINE AND 27/100 DOLLARS ($1,060,649.27), plus attorney's fees.

IT IS FURTHER ORDERED that Arete has established its fraud claim against Gunnerman by clear and convincing evidence and thus is entitled to actual damages for fraud in the amount of ONE MILLION SIXTY THOUSAND SIX HUNDRED FORTY-NINE AND 27/100 DOLLARS ($1,060,649.27), as well as exemplary damages in the amount of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00).

IT IS FINALLY ORDERED that Arete shall file a notice with the Court within ten (10) days of the date of the entry of this order making an election between the remedies for its breach of contract and its fraud causes of action.[9]

SIGNED this the 3rd day of May 2006.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE

---

[9] In the event Arete elects recovery under its contract cause of action, an application for attorney's fees should be prepared and filed after entry of judgment in compliance with Local Rule CV-7(i).